Jonah A. Toleno, Esq.
SHUSTAK & PARTNERS, P.C.
401 West "A" Street, Suite 2330
San Diego, CA 92101
State Bar No. 023503
Telephone: (619) 696-9500
Facsimile: (619) 615-5290
Email: jtoleno@shufirm.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Steven Bocker; Sadie LaBerge; and Jay Wise,

                Plaintiffs,

      v.

Deer Consumer Products, Inc.; Yuehua Xia; Zongshu Nie; Arnold Staloff; Qi Hua Xu; Yongmei Wang; Man Wai James Chiu; Walter Zhao; Edward Hua; Bill Ying He; Goldman Kurland Mohidin LLP; and Ahmed Mohidin,

                Defendants.

Case No.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

JURY TRIAL DEMANDED

TO THE COURT AND ALL INTERESTED PARTIES:

      Plaintiffs Steven Bocker, Sadie LaBerge, and Jay Wise ("Plaintiffs") hereby complain against Defendants Deer Consumer Products, Inc. ("Deer"), Yuehua Xia, Zongshu Nie, Arnold Staloff, Qi Hua Xu, Yongmei Wang, Man Wai James Chiu, Walter Zao, Edward Hua, Bill Ying He (the "Individual Defendants"), Goldman Kurland Mohidin, LLP and Ahmed Mohidin ("GKM") as follows:

- 1 -
COMPLAINT

# SUMMARY

1.      This is a federal securities fraud action brought by Plaintiffs against Defendants Deer, the Individual Defendants, and GKM for violations of the Securities Exchange Act of 1934 (the "Exchange Act").   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      Deer is a Nevada holding company that operates through subsidiaries in the People's Republic of China.  Deer became publicly traded in 2008 and was listed on the NASDAQ from 2009 until 2012.  Deer filed reports with the SEC, the Chinese State Administration of Taxation ("SAT") and the Chinese State Administration of Industry and Commerce ("SAIC").

3.      Accounting firm Goldman Kurland Mohidin, LLP, located in Encino California, became Deer's registered independent auditor on September 3, 2008. Ahmed Mohidin was the primary auditor for Deer; however, GKM conducted these audits through a Beijing-based audit firm.

4.      Plaintiffs purchased approximately $344,000 in Deer securities (30,050 shares) and sold $15,426 in Deer securities between March 2010 and May 2010.  During this time, Deer traded between $12.65 and $7.65 per share.  At the time of purchase, Plaintiffs were unaware that the SEC reports filed by Deer and audited by GKM were false.

5.      In March 2011 analyst Jon Carnes[1] published two reports on the investment blog www.alfredlittle.com exposing discrepancies between Deer's SEC and SAIC filings.  The day the second report was published, Deer's stock fell 21.6%.  On March 28, 2011, Deer sued the analyst for defamation – ultimately losing the suit.

---

[1] The blot magazine (www.theblot.com) is an online platform which allows anyone to publish an article without editorial oversight.  An author has posted articles accusing Jon Carnes of running a criminal syndicate; however, they are unfounded accusations and not corroborated by any reliable source.

6.     On April 4, 2011, financial analyst Andrew Left published a report alleging that Deer committed federal securities fraud.  Subsequently, Deer's stock priced dipped 12%.

7.     On December 15, 2011, Deer's stock dropped 17.3% after investigative journalist Roddy Boyd[2] published an article alleging Deer committed fraud.  Deer responded to what it deemed "false market rumors by a distressed online blogger," assuring investors Deer was on schedule to pay a quarterly cash dividend of $.05 per share.  Plaintiffs held their stock.

8.     In a Form 8-K filed with the SEC on October 9, 2012, Deer announced that the NASDAQ intended to delist Deer's stock, citing the following: (1) Deer made false and misleading disclosures regarding the operational status of its manufacturing facilities in Yangjiang, China; (2) Deer failed to provide complete responses to NASDAQ staff's questions regarding Deer's customers, suppliers and shipping providers; and (3) Deer was involved in a scheme to illicitly transfer corporate funds to a group of stockbrokers through a bogus consulting contract.

9.     On the first day trading resumed on the Over-the-Counter ("OTC") market, Deer's stock price fell from $2.26 (price before delisting) to $.035, reflecting the informed market price.  Deer currently trades on the OTC for approximately $.04 per share.

10.    Plaintiffs first received notice of a federal securities fraud class action settlement against Deer and the Individual Defendants in April 2013.  The class consisted of all persons, other than Deer and the Individual Defendants, who

---

[2] An author on www.theblot.com accused Roddy Boyd of fraudulent journalism and taking bribes; however, these accusations are unfounded and not corroborated by any reliable source.

COMPLAINT

1   purchased Deer's common stock between August 13, 2009, and March 21, 2011.[3]
2   Plaintiffs opted out of the class and settlement on July 4, 2013.

3       11.     On March 8, 2013, a class action complaint was filed by Antoine De
4   Sejournet, individually and on behalf of all other similarly situated plaintiffs,
5   against Goldman Kurland Mohidin, LLP and Ahmed Mohidin for federal
6   securities fraud.[4]   This case was referred to alternative dispute resolution on
7   August 28, 2014, and remains pending.

8       12.     Plaintiffs purchased and held Deer securities during a period of false
9   and materially misleading reporting -- perpetrated by Deer, the Individual
10  Defendants, and GKM -- at artificially inflated share prices.  Once securities fraud
11  was publicly confirmed, Plaintiffs' investment in Deer was rendered virtually
12  valueless.  Plaintiffs have suffered devastating financial loss due to Defendants'
13  fraud and would not have invested in Deer had they known of its true financial
14  condition.

15              **JURISDICTION AND VENUE**

16      13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the
17  Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §
18  240.10b-5).

19      14.     This Court has jurisdiction over the subject matter of this action
20  pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C §
21  78aa).

22      15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391
23  (b)-(d) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and under the rule
24  of law announced in *Investors Protection Corp. v. Vigman*, 764 F.2d 1309 (9th
25  Cir. 1985).

26

27  [3] James Rose v. Deer Consumer Products, Inc. et al., No. 2:11-cv-03701, 2011 WL
    7615197 (C.D. Cal. Sept. 6, 2011).
28  [4] Antoine de Sejournet v. Goldman Kurland Mohidin LLP et al., No. 13-cv-1682, 2013
    WL 1089581 (C.D. Cal. Mar. 8, 2013).

- 4 -
COMPLAINT

16.     Plaintiffs reside in Arizona, the District where the offer and sale of Deer securities took place.

17.     In connection with acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate wire and telephone communications, and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiffs Steven Bocker, Sadie LaBerge, and Jay Wise purchased Deer securities between March and May of 2010 at artificially inflated prices causing substantial damages.

19.     Plaintiffs are informed and believe, based upon reasonable inquiry, and upon such information and belief, that the information about Defendants listed in ¶¶ 20-37 is accurate.

20.     Defendant Deer Consumer Products, Inc. ("Deer") is a Nevada Corporation whose principal place of business is located at Area 2, 1/F, Building M-6, Central High-Tech Industrial Park, Nanshan, Shenzhen, China 51807.

21.     Deer became a publicly traded company in the United States by reverse merger – a process by which a company acquires a U.S.-based shell company listed on a domestic stock exchange.  By acquiring the listed company, Deer acceded to the listing without going through the full process of an initial public offering.  On July 17, 2009, Deer's stock was actively traded on the NASDAQ under the ticker DEER.  Prior to this date, it was traded on the OTC Bulletin Board under DEER.

22.     Defendant Yuehua Xia ("Xia") was Deer's CFO from September 2008 until August 2009.

23.     Defendant Zongshu Nie ("Nie") was named Deer's CFO in August 2009 and a joined the Board of Directors in April 2009.  Nie was the Financial Controller from 2008.  Nie owned 7.99% of outstanding common shares (1.8 million) as of March 31, 2009.  Between March 31, 2009, and March 2, 2010, Nie sold 235,434 shares of Deer common stock profiting between $1 and $4.5 million, calculated based on the range shares were trading during that timeframe.  Nie violated SEC regulations by failing to file a Form 4 with the SEC for this sale.

24.     Defendant Arnold Staloff ("Staloff") was a Director of Deer as of September 2009 and the Chair of the Compensation Committee.  He was also a member of the Audit Committee and the Nominating and Corporate Governance Committee.  On October 1, 2012, Staloff resigned from all committees prompting NASDAQ staff to inform Deer that, due to the resignation of Staloff, Deer no longer complies with NASDAQ's independent director and audit committee requirements under NASDAQ Listing Rule 5605.  Accordingly, Staloff's resignation served as an additional basis for delisting Deer's securities.

25.     Defendant Qi Hua Xu ("Xu") was a Director of Deer from September 2009 and served as the Chair of the Compensation Committee and as a member of the Audit Committee and Nominating and Corporate Governance Committee.

26.     Defendant Yongmei Wang ("Wang") was appointed President of Deer in May 2010.  From 1995 to 2010 Wang was the Head of International Sales and the Corporate Secretary for Deer.

27.     Defendant Man Wai James Chiu ("Chiu") was the Director of Deer from September 2008 to April 2009 and the Chief Operating Officer and Head of the Asia Pacific Division from September 2008.  Chiu owned 4.79% of Deer's outstanding shares (1.083 million) as of March 31, 2009.  Deer's March 2, 2009 10-K reported Chiu had sold 141,260 shares of common stock, violating SEC regulations by failing to file a Form 4 with the SEC.  Based on the range of share

price traded during this time, Chiu profited between $551,000 and $2.7 million dollars for the sale of his shares.

28.     Defendant Walter Zhao ("Zhao") was a Director of Deer from May to September 2009 and the President from September 2009 to May 2010.

29.     Defendant Edward Hua ("Hua") was a Director of Deer from April 2009 and served as the Chairman of the Nominating and Corporate Governance Committees.

30.     Defendant Bill Ying He ("Ying He") was a founder of Deer as well as Chairman and CEO.  As of March 31, 2009, Ying He owned 8,348,125 shares of Deer common stock or 36.94% of Deer's outstanding shares.  As of March 2, 2010, Ying He reported owning 7,269,240 shares of Deer common stock.  During the period from March 31, 2009 to March 2, 2010, Ying He sold 1,078,885 shares of Deer common stock violating SEC regulations by failing to file a Form 4 with the SEC.  Based on the range in which Deer's share price traded during that time, Ying He received proceeds of between $3 million and $19 million for the sale of his shares.

31.     Defendant Goldman Kurland and Mohidin, LLP is an audit firm based in Encino, California, and has been Deer's registered independent auditor since September 3, 2008.

32.     Defendant Ahmed Mohidin is a name partner at Goldman Kurland and Mohidin, LLP (collectively "GKM") and was the primary auditor assigned to Deer.

## **RELEVANT ENTITIES**

33.     During the period Plaintiffs purchased Deer securities, Deer (a U.S. company) owned Deer International (a British Virgin Islands company).  Deer International, in turn, owned two operating companies named Winder Electric

Group, Ltd. ("Winder") and Delta International, Ltd. ("Delta"), both organized under the laws of the People's Republic of China.

34.     Winder manufactured and delivered Deer's products, and Delta sold them.

35.     Deer also incorporated two new operating companies named Deer Technology Co., Ltd., and Anlin Technology Co., Ltd., as subsidiaries of Winder.

36.     Delta transferred all of its material operations to Winder between 2008 and 2009.

37.     In both Chinese SAIC and Chinese SAT filings, a parent company does not consolidate the financial statements of its majority-owned subsidiaries. However, Winder and Delta were Deer's only operating subsidiaries so Deer's revenues cannot exceed Winder and Delta's combined revenues.   Hence, for purposes of this Complaint, Deer's SAIC and SAT-reported revenues are simply a sum of Winder and Delta's revenues.

### STATUTE OF LIMITATIONS AND TOLLING

38.     Plaintiffs first learned of rumors indicating potential securities violations no earlier than December 21, 2011, when Deer released a rebuttal against "a fictitious group known as Alfred Little" – alleged by Deer to have published a negative report about Deer in order to profit from shorting its stock. Deer assured investors it was conducting its normal course of business and was not aware of any negative developments within the company.  This is the earliest date an investor in Plaintiffs' position would have reasonably discovered fraud.

39.     The class action against Deer and the Individual Defendants was filed on April 29, 2011.  Plaintiffs opted out of class action on July 4, 2013, sixteen months before filing this Complaint.

40.     The class action against GKM was filed on March 8, 2013, less than fifteen months after Plaintiffs first learned of allegations of securities fraud

committed by Deer.  The class action was referred to alternative dispute resolution on August 28, 2014 and is still pending.

41.     Accounting for the months tolled during class action securities litigation against all Defendants, this action was filed within two years of the earliest possible date of discovery of the fraud and within five years of Plaintiffs' purchase of the securities giving rise to this cause of action.

## STATEMENT OF FACTS

### A.  The Purchase of Securities by Plaintiffs and the Presumption of Reliance

42.     Plaintiffs purchased Deer securities with the U.S. online broker TD Ameritrade as an investment for their stock portfolios.

43.     Plaintiffs' investment decision was based upon SEC filings, third party recommendations, third party publications, and Deer's publications and company website.   Numerous analysts described Deer as a reputable and profitable business with expectations of continued performance.  Deer's reputation was bolstered by naming large, well-known companies as clients such as Wal-Mart, Disney, Black and Decker, Betty Crocker, Kenwood, and Home Depot.

44.     At the time of Plaintiffs' purchase, Deer's stock price ranged, on average, from $7.65 to $12.65 per share.  The stock had good daily trading volume, attractive earnings, high sales, and strong prospects for continued performance.

45.     When    controversial    reports    were    first    published    on www.alfredlittle.com, Deer denied the allegations.  Deer's stock continued to pay dividends, and report sales and earnings indicating to reasonable investors it was prudent to hold the stock.

46.     At all relevant times, the market for Deer's common stock was an efficient market for the following reasons:

a. Deer's stock met the requirements to trade on the NASDAQ, a highly efficient automated market;

b. During the period Plaintiffs purchased Deer securities, Deer was trading between $7.65 and $12.65 per share.  The average weekly trading volume during those months was nearly 500,000 demonstrating a very active and broad market for Deer stock and permitting a very strong presumption of an efficient market;

c. As a regulated issuer, Deer filed periodic public reports with the SEC during the time Plaintiffs purchased and held Deer securities;

d. Deer regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and communications with the financial press;

e. Deer was followed by several securities analysts employed by major brokerage firms who published reports on Deer.  These reports were distributed to sales teams and brokerage firm customers during the time Plaintiffs' purchased Deer securities;

f. Numerous NASD member firms were active market-makers in Deer stock at all times during the purchase period; and

g. Materially significant news about Deer was rapidly reflected in its stock price.

**B.  Deer's False and Materially Misleading Statements and Omissions of Material Fact**

***Deer's Reports to Chinese and United States Regulators are Significantly Contradictory***

47.    Plaintiffs are informed and believe, based upon reasonable inquiry, and upon such information and belief, that the information listed in ¶¶47-92 is accurate.

48.     Until 2009, revenue claimed in Deer's SEC filings and in its subsidiaries' SAIC and SAT filings matched.  The 2008 SAIC, SEC and SAIC filings diverged by approximately 1%:

| (USD) | SEC Fiscal Year 2008 | SAIC Fiscal Year 2008 | SAT Reported Revenues 2008 |
|---|---|---|---|
| Revenue | $43,785,000 | $44,322,000 | $42,963.768 |
| Net Income | $3,357,000 | $3,352,000 | |

49.     Except for minor differences, which can be accounted for by the exchange rate (calculated at 6/9 RMB/USD) and differences in revenue recognition between the U.S. and China, the difference between SEC and SAIC figures in 2008 were only 4.9% of revenue and 1.2% of net income.

50.     Deer's SAIC and SEC filings began to widely differ on Deer's Form 10-Q (a comprehensive report of a company's performance submitted quarterly to the SEC) for the quarter ending June 30, 2009.

51.     Deer, as a Wholly Foreign Owned Enterprise, is required to audit its Chinese SAIC filings using China's Generally Accepted Accounting Principles ("Chinese GAAP"); principles which are not materially different than U.S. GAAP. There is little reason for any significant difference in SAIC and SEC reporting.

52.     The Chinese SAIC imposes penalties, including fines and revocation of business licenses, for inaccurate financial reporting.  A business cannot operate legally in China without a business license, and the People's Bank of China requires the closing of that entity's bank account, making business, for all practical purposes, impossible.   A Chinese company cannot continue to do business without substantially accurate reporting to the SAIC.

***False and Fraudulent Statements to the SEC in 2009***

53.     Reporting to Chinese and U.S. regulators began to diverge when Deer sought an infusion of capital from U.S. investors.  Starting in 2009, Deer's SEC

COMPLAINT

reports of revenue and growth were extraordinarily higher than concurrent SAIC and SAT reports.

54.     In 2009, Deer claimed revenues of $81.3 million and a net income of $12.4 million – 2.5 times its actual revenues and 10 times its actual profits – to the U.S. investing public.  Concurrently, Deer reported to the SAIC and SAT revenues of only $31 million and net income of $1.4 million:

| (USD) | SEC Fiscal Year 2009 | SAIC Fiscal Year 2009 | SAT Reported Revenues 2009 |
|---|---|---|---|
| Revenue | $81,300,000 | $31,248,843 | $31,913,235 |
| Net Income | $12,400,000 | $1,395,588 | |

55.     Plaintiffs purchased Deer securities in 2010 based, in significant part, on positive reports of revenue and profits in the prior year's SEC filings.

56.     June 30, 2009, Deer filed its Form 10-Q quarterly report for period ending June 30, 2009, with the SEC ("2009 2nd Quarter 10Q").  The 2009 2nd Quarter 10Q was signed by, and separately certified by, defendants Ying He and Yuehua Xia pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  By certifying the report, He and Xia attested to the accuracy of the financial statements and that the statements were not fraudulent.

57.     The 2009 2nd Quarter 10Q reported the following revenue and net income:

| | SEC 3 Months Ended 6/30/2009 | SEC 6 Months Ended 6/30/2009 | (SAIC Fiscal Year 2009) |
|---|---|---|---|
| Revenue | $15,310,503 | $22,182,719 | $31,248,843 |
| Net Income | $1,714, 876 | $2,371,750 | $1,395,588 |

58.     Deer's reported net income figure for three months ending June 30, 2009 was false because the $1.7 million of net income for these three months exceeded all of the revenue Deer reported in its SAIC filings for the entire fiscal year of 2009.

COMPLAINT

59.     Deer's reported net income figure of $2.37 million for six months ending June 30, 2009 was patently false as it exceed the entirety of revenue reported to the SAIC that year by nearly $1 million.

60.     A comparison of Deer's financial statements for the three months ending June 30, 2009, and the three months ending March 31, 2009, further suggest that the 2009 2nd Quarter results were false based upon percentage increase:

|  | 3 Months Ended 3/31/2009 | 3 Months Ended 6/30/2009 | Percentage Increase |
|---|---|---|---|
| Revenue | $6,872,000 | $15,310,503 | 220% |
| Net Income | $656,000 | $1,714,876 | 261% |
| Net Margin | $9.5% | 11.2% | 118% |

61.     False financial reporting continued in Deer's 2009 Form 10-Q ("2009 3rd Quarter 10Q").  The 2009 3rd Quarter 10Q was, pursuant to SOX, separately certified by Ying He and Nie who each attested to the accuracy of the financial statements and that the financial statements were free from fraud.

62.     Deer's 2009 3rd Quarter 10Q was false because its net income for those three months exceeded the SAIC reported net income for the entire year of 2009 by $2.7 million:

|  | SEC 3 Months Ended 9/30/2009 | SEC 9 Months Ended 9/30/2009 | SAIC Fiscal Year 2009 |
|---|---|---|---|
| Revenue | $26,541,039 | $48,723,758 | $31,248,843 |
| Net Income | $4,122,773 | $6,494,523 | $1,395,588 |

63.     Due to misleading and falsely positive SEC filings and false financial statements to investors, Deer's stock price rose from $6.1 to $14.76 from the day the 2009 2nd Quarter 10Q was issued until the 2009 3rd Quarter 10Q was issued.

64.     False and misleading statements inflated Deer's stock price in advance of its secondary public offering.

65.   On December 17, 2009, Deer completed an offering of 6.9 million shares at $11 per share.  This offering was made pursuant to a Prospectus (dated December 12, 2009) and a Registration Statement (dated October 9, 2009), which repeated false and misleading financial statements.   Deer's proceeds were $70,938,900.   Deer's PIPE investors also made substantial profits by unloading shares purchased in private placements.

66.   The October 9, 2009 Registration Statement was a "Shelf Offering" allowing Deer to sell registered stock at a future date.  Deer maintained $54.1 million worth of stock "on the shelf" to sell to future investors.  The October 9, 2009 Registration Statement was signed by Defendants Ying He, Nie, Hua, Staloff, and Xu.

67.   On March 2, 2010, Deer filed a false and misleading Form 10-K for the year ending December 31, 2009 (the "2009 10-K").  Deer overstated its fiscal 2009 revenue by $50.7 million and overstated its net income by almost $10.9 million.  The overstatement is illustrated below by comparing the Chinese SAIC filing and the performance reported to the SEC:

| (USD) | SEC Fiscal Year 2009 | SAIC Fiscal Year 2009 | Amount of Overstatement | Percentage Overstated |
|---|---|---|---|---|
| Revenue | $81,342,680 | $31,248,843 | $50,093,837 | 260% |
| Net Income | $12,369,062 | $1,395,588 | $10,973,474 | 886% |

68.   Deer's SAIC filings reveal that Deer had a period of gradual growth until a global financial downturn caused it to suffer a decrease in profits and revenue.  In stark contrast, Deer's SEC filings show a company gradually growing until, during the global financial downturn, it doubled its revenues and quadrupled its net income in a year.

69.   Deer did not take any capital expenditures to cause the dramatic increase in revenue, and the value of its property and equipment remained virtually unchanged from December 2008 to December 2009.

70.    A letter from the SEC to Deer dated May 19, 2010, specifically questioned the abnormal growth:

> Refer to your discussion of revenues beginning on page 32. ***In light of the global economic slowdown, on which you comment in a risk factor on page 12, please expand your discussion*** to provide more detailed analysis specifically identifying the reasons (e.g. new products, new agreements, entering new markets, increasing advertising, changes in pricing, etc.) behind the significant increases in revenue the company has experienced.  Please be very specific in your response.   For instance, you mention increased marketing efforts, particularly in China, but even US revenue increased 49% in 2009 and 108% during the first quarter of 2010.  ***Please address this in your response, and explain why you believe that the concerns raised in your risk factor on page 12 have not resulted in decreased revenues, and instead, significantly higher revenues***.

(Emphasis added).

71.    Deer's SEC filings for fiscal year 2009 reported operating margins of 17.5%; SAIC filings reported much less favorable operating margins of 4.0%.

72.    Deer reported high and increasing margins while similarly or better situated competitors reported much lower operating margins.  BBK, Joyoung, and Supor -- manufacturers of small appliances for the Chinese market -- saw low and declining margins during the same time period Deer reported high margins.

***False and Fraudulent Statements to the SEC Continue Through 2010***

73.    On May 10, 2010, Deer filed its quarterly report for the quarter ending March 31, 2010 (the "2010 1st Quarter 10Q").  The financial results continue the trend of implausibility:

| (USD) | 3 Months Ended 3/31/2009 | 3 Months Ended 3/31/2010 | 2009/2010 % increase |
|---|---|---|---|
| Revenue | $6,872,000 | $23,902,000 | 348% |
| Net Income | $656,000 | $4,037,000 | 615% |

74.    On August 10, 2010, Deer filed its quarterly report for the quarter ending June 30, 2010 (the "2010 2nd Quarter 10Q").  The 2010 2nd Quarter 10Q continued to present false and misleading revenue and income figures.

75.    The 2010 2nd Quarter 10Q claimed dramatic growth over the 2009 2nd  quarter – growth over the previous year's numbers which were themselves drastically inflated:

| USD | 3 Months Ended 6/30/2009 | 3 Months Ended 6/30/2010 | 2009/2010 % increase |
|---|---|---|---|
| Revenue | $15,310,503 | $34,451,000 | 225% |
| Net Income | $1,714,876 | $6,021,000 | 351% |

76.    On November 10, 2010, Deer filed its quarterly report for the quarter ending September 30, 2010 (the "2010 3rd Quarter 10Q").  The 2010 3rd Quarter 10Q continued to present false and misleading revenue and income figures.

77.    The 2010 3rd Quarter 10Q claimed dramatic growth over the 2009 3rd Quarter 10Q – again, growth over the previous year's numbers which were already drastically inflated:

| (USD) | 3 Months Ended 9/31/2009 | 3 Months Ended 9/31/2010 | 2009/2010 % increase |
|---|---|---|---|
| Revenue | $26,541,000 | $55,263,000 | 208% |
| Net Income | $4,123,00 | $9,266,000 | 225% |

78.    On March 10, 2011, Deer issued its annual report for the year ending December 31, 2010 (the "2010 10-K").  The 2010 10-K continued to present false and misleading revenue and income figures.

79.    For further illustration, numbers below represent the 2009 fiscal year results filed with the Chinese SAIC compared with the 2010 fiscal year results filed with the SEC – representing the implausible revenue and net income growth of 563% and 2174% respectively:

COMPLAINT

| (USD) | SAIC Fiscal Year 2009 report | SEC Fiscal Year 2010 report | 2009/2010 % Increase |
|---|---|---|---|
| Revenue | $31,248,843 | $175,847,000 | 563% |
| Net Income | $1,395,588 | $30,349,000 | 2174% |
| Margin | 17.3% | 4.3% | 402% |

80.     In 2010, Deer's SEC and SAIC reported revenues were nearly the same at about $175 million; however, Deer only reported revenues of $64 million to the SAT -- overstating its revenue to the SEC by 172%.

81.     An investigator for Jon Carnes reported that Deer began shuttering its Yangjiang factories in the summer of 2011 and fewer than 100 employees remained by the end of the year.

82.     In 2011, Deer reported to the SEC a record year in revenues of $227 million -- the same year it had failed to disclose to investors it had shut down operations and fired numerous workers.

83.     In 2012, the NASDAQ delisted Deer's securities citing the following: (1) Deer made false and misleading disclosures regarding the operational status of its manufacturing facilities in Yangjiang, China; (2) Deer failed to provide complete responses to NASDAQ staff's questions regarding Deer's customers, suppliers and shipping providers; and (3) Deer was involved in a scheme to illicitly transfer corporate funds to a group of stockbrokers through a bogus consulting contract.

84.     Deer resumed trading on the OTC market in 2013 with a current share price of approximately $.04, a reflection of the price of Deer's securities in a fully informed market.

***Deer Omitted the Material Fact that Its CEO was Directly Competing with Deer***

85.     Deer's 2009 10-K and the 2010 10-K each state that "as of September 28, 2009, [Ying He] serves exclusively as Chairman and Chief Executive Officer."

86.     However, while Ying He was serving as Deer's Chairman and CEO, he was concurrently serving as a director of a company, registered in Hong Kong, named 50HZ Electric.

87.     Ying He also served as a registered supervisor at Shenzhen Demeilong Electric Co., Ltd. ("SDEC"), a company owned by Qiyun Xu (Ying He's wife) and Xianping He (Ying He's father).

88.     50 HZ Electric and SDEC shared the same operations address in Shenzhen and sold products in competition with Deer.

89.     Bills of lading reveal that 50HZ Electric shipped containers from Winder's address to clients Winder also serviced, suggesting Ying He sold Deer products for the benefit of 50HZ or was, at the least, a direct competitor.

90.     Regulation S-K requires disclosure in annual reports and prospectuses of the business experience of the company's executives and officers.

91.     Defendant Ying He, Deer's Chairman and CEO, was a director and owner of two direct competitors of Deer.  This experience was material, the non-disclosure of which was materially misleading.

92.     Deer stated in SEC filings that 50HZ Electric was wholly owned by two if its shareholders, but omitted the fact that one of those shareholders was Deer's Chairman and CEO.

**C.   GKM's Material Misrepresentations and Omissions**

93.     Incorporate ¶¶47-84 by reference.

94.     Plaintiffs are informed and believe, based upon reasonable inquiry, and upon such information and belief, that the information listed in ¶¶95-109 is accurate.

95.     When Plaintiffs invested in Deer, Deer was a Nevada holding company whose stock was listed on the NASDAQ.  Because of its U.S. listing, Deer made quarterly and annual (10-K) reports to the SEC.

96.     All U.S. publicly traded companies must have a registered independent auditor.  The required 10-K financial statements must be audited by the company's auditor – here, GKM.  GKM audited Deer's financial statements for the years ending December 31, 2008, through December 31, 2011.  For each audit, Ahmed Mohidin was the primary audit partner.

97.     The Public Accounting Oversight Board (the "PCAOB") governs auditing performance per PCAOB standards.  In each of GKM's audits of Deer, for the years 2008 through 2011, GKM's audits stated that (1) GKM performed its audits in accordance with PCAOB standards and (2) Deer's financial statements comported with Generally Accepted Accounting Principles ("GAAP").

98.     GKM's representation of Deer's financial statements as accurate and in compliance with GAAP was false.  Deer overstated its revenues in 2009, 2010, and also 2011 when Deer claimed to have earned unprecedented revenues even though it had largely shuttered its factories by the end of 2011.

99.     For the year ending December 31, 2008, GKM wrote, in pertinent part, the following statement for Deer's 10-K filing with the SEC:

> Dear Board of Directors and Stockholders of
> Deer Consumer Products, Inc.
>
> We have audited the accompanying consolidated balance sheets of Deer Consumer Products, Inc. and Subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of income and other comprehensive income, stockholders' equity, and cash flows for the years ended December 31, 2008 and 2007.
>
> [. . .]
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Deer Consumer Products, Inc., and subsidiaries as of December 31, 2008 and 2007 and the consolidated results of their operations and their consolidated cash flows for the years ended

December 31, 2008 and 2007, in conformity with U.S. generally accepted accounting principles.

100.   For year ending December 31, 2009, GKM wrote substantially the same statement as December 31, 2008, changing the dates accordingly.

101.   For the year ending December 31, 2010, the following statement from GKM accompanied Deer's 10-K filing with the SEC:

> A material weakness is a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  The following material weaknesses were identified:
> -   Ineffective documentation and testing of Information Technology related to controls over financial reporting.
> -   Lack of technical accounting expertise among financial staff regarding the requirements of the PCAOB Auditing Standard No 5 and COSO in the assessment of internal control over financial reporting.
> [. . .]
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Deer Consumer Products, Inc. as of December 31, 2010 and 2009 and the consolidated cash flows for the years ended December 31, 2010, 2009 and 2008 in conformity with accounting principles generally accepted in the United States of America.
> [. . .]
> Our opinion on the effectiveness of the internal control over financial reporting does not affect our opinion on the consolidated financial statements.

102.   For the year ending December 31, 2011, GKM wrote substantially the same statement regarding Deer's financial statements as year ending December 31, 2010; however, it identified as a material weakness the "[l]ack of

COMPLAINT

technical accounting expertise among financial staff regarding (a) GAAP (b) requirements of the PCAOB Auditing Standard No 5 and COSO in the assessment of internal control over financial reporting."

103.   While GKM's last two auditing reports identified weaknesses in Deer's internal controls, GKM goes on to state that this "does not affect [GKM's] opinion on the consolidated financial statements" which GKM reported were in conformity with GAAP.

104.   The statements referenced in ¶¶99-102 were made by GKM, filed with the SEC accompanying Deer's 10-K, and thereafter made available on the SEC website EDGAR.  These statements were specifically false because:

    a. GKM's audit did not comport with PCAOB Standards year ending December 31, 2009, December 31, 2010, or December 31, 2011, because GKM did not investigate that (1) Deer's financial statements showed a dramatic increase in revenues inconsistent with past performance; (2) Deer's margins were inconsistent with larger and more established competitors; and (3) Deer subsidiaries filed taxes showing that Deer's SEC filings substantially overstated its financial performance.

    b. Beginning with the year ending December 31, 2009, GKM's assertions that Deer's financial statements were presented in accordance with GAAP were false because the statements greatly overstated revenues.

105.   Contrary to their assurances, GKM conducted their audits with astonishing recklessness.

106.   GKM continued to review and audit Deer's false SEC filings even after the class action suit was filed by James Rose, et al. against Deer and the

Individual Defendants, and after analyst reports raised flags about contrary reporting to the SEC and Chinese regulators.

107.  In 2011 the NASDAQ found Deer had failed to disclose to investors that it had shut down operations and fired numerous workers in China.  Deer still reported increased revenues to the SEC that year.  GKM certified the corresponding financial report.

108.  PCAOB Standards require that an auditor obtain sufficient competent evidential matter to support its opinion that the client's financial statements were accurately stated.  GKM failed to obtain Deer's tax filings.

109.  GKM has the responsibility to correct financial statements it finds are materially inaccurate to ensure the public no longer relies on its audit report; however, GKM has failed to correct any financial statements that were materially inaccurate even in light of numerous indications of falsity.

***GKM Lacked the Required Independence to Meet PCAOB Standards***

110.  Plaintiffs are informed and believe, based upon reasonable inquiry, and upon such information and belief, that the information listed in ¶¶111-127 is accurate.

111.  Audits which rely on subcontracted auditors to perform portions of the audit have two options -- they can disclose in their audit report their reliance on the subcontracted auditor or make no reference and assume the responsibility for the work of the subcontracted auditor, including any mistakes or fraud.

112.  Because GKM is a California-based company, GKM employed Beijing Evertrust CPAs Ltd. ("BET") to conduct Deer's audits.

113.  GKM makes no reference to BET in its reports.

114.  It is crucial auditors are independent of the companies they audit. The PCAOB and the SEC have passed detailed rules and standards setting out when auditors lack independence.  For example:

a. If an auditor is not independent, literally no task it performs complies with PCAOB Standards;

b. An auditor is not independent if anyone supervising an audit does material business with the client; and

c. An auditor is not independent if anyone supervising an audit is a promoter of the client.

115.   PCAOB Standards also require that the auditor disclose in writing to its potential clients, prior to the engagement, any relationship it (including its employees) or any affiliate has with the client that may bear on independence.

116.   The SEC rules provide that an accounting firm, including an associated firm, may not be employed as a promoter of the client.

117.   An auditor is not independent if any covered person's close family member has filed with the SEC, concerning a client, a Schedule 13D or 13G – required if a person owns more than 5% of a public company's stock.

118.   Benjamin Wey (formerly Benjamin Wei, not listed as a defendant), owned New York Global Group ("NYGG") which promoted China-based companies, helped list Chinese companies, and organized their financial statements.   Numerous investigations and allegations contend Wey habitually purchased company stock, helped his client companies overstate their financial data, subsequently sold his stock, and left investors with a worthless shell company investment.

119.   Wey referred many of his Chinese clients to GKM, including Deer, which subcontracted with BET to conduct audits.

120.   BET's International Audit Division does not consolidate its finances with the remainder of BET, and obtains substantially all of its revenues from auditing GKM's clients and Wey's companies.

121.   As of December 2011, BET International Auditing Division operated in the same six-story building in Beijing as NYGG.  BET and NYGG had a door connecting office space, NYGG and BET shared a computer server giving Wey direct access to auditing files, and BET's General Manager is Mr. Wei, the former alias for Wey.  This information, along with photos, was revealed in an exposé published by journalist Roddy Boyd.

122.   A press release issued by NYGG stated that, since June 2009, it "began acting as the exclusive advisor to [Deer] […] NYGG led DEER to set the record for a Chinese company uplisting to NASDAQ's main board in 47 working days and then advised on DEER's second round financing on the NASDAQ in September 2009 […]  On December 10, 2009, NYGG help[ed] DEER to complete a third round financing […] Since it went public in the US under the direction of NYGG, DEER has since completed financing amounting to $94 million in one year."

123.   Wey does material business with Deer and supervises Deer's audit via BET, violating independent audit requirements

124.   On September 20, 2010, Tianli Wei, Benjamin Wey's sister, filed a Schedule 13D indicating she owned more than 5% of Deer's stock (6.3% or about $17 million in Deer shares).

125.   Hence, the audit by BET is not independent because Wey promotes Deer in the United States through NYGG and Wey's relative owned more than 5% of its stock; therefore, GKM is not independent because it used BET, which Wey manages, as its subcontracting auditor.

126.   Because the principal auditor, GKM, made no reference to the subcontracted auditor BET in its audit report, GKM assumes responsibility for the work of BET including any mistakes or fraudulent statements.

127.   GKM certified that their audits complied with PCAOB Standards; however, because GKM was not sufficiently independent, compliance was impossible.

**D.   Inference of Scienter From Magnitude of the Reporting Discrepancy**

*Scienter Inferred by the Activities of Deer and the Individual Defendants*

128.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

129.   Scienter is strongly inferred based on the extreme inconsistency between figures reported to U.S. and Chinese regulators.

130.   Plaintiffs are informed and believe, and upon such information and belief, that by virtue of their positions, Deer and Individual Defendants had actual knowledge of material misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard upon every indication of material misrepresentations and omissions amounting to federal securities fraud as committed.

*Scienter Inferred by Activities of GKM*

131.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.   Plaintiffs are informed and believe, and upon such information and belief, that GKM had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by certifying audits of financial reports which contained material misrepresentations and omissions amounting to federal securities fraud.

**E.   Plaintiffs' Loss Directly and Substantially Caused by Wrongs Committed by Deer, the Individual Defendants, and GKM**

133.   In March 2011 analyst Jon Carnes published, on the website www.alfredlittle.com, a report (the "Report") asserting that Deer had concealed

materially adverse information from investors.   The Report questioned the veracity of information in Deer's financial statements and press releases.   The Report listed various allegations indicating fraud.

134.   On March 14, 2011, Deer filed a Form 8-K in immediate response to the Report.   Deer vehemently denied the allegations of fraud, preventing a decline in its stock price that may have otherwise resulted from the damaging allegations.

135.   On March 21, 2011, www.alfredlittle.com published a follow-up article providing further evidence of fraud.

136.   On March 21, 2011, Deer's stock price fell 21.6% on extraordinarily heavy trading volume, seriously damaging investors including Plaintiffs.   Deer's stock continued to fall.   Deer never issued a rebuttal.

137.   On April 4, 2011, analyst Andrew Left published an article claiming that GKM was financially beholden to Wey and that Deer overstated its revenues. That same day, Deer's stock price dipped as much as 12% closing at $6.46.

138.   On December 15, 2011, Roddy Boyd published an article concluding that GKM was beholden to Benjamin Wey and NYGG.   That day, Deer's stock price fell 17.3% to $4.02

139.   In August 2012 NASDAQ halted trading in Deer stock because (1) Deer made false and misleading disclosures regarding the operational status of its manufacturing facilities in Yangjiang, China; (2) Deer failed to provide complete responses to NASDAQ staff's questions regarding Deer's customers, suppliers and shipping providers; and (3) Deer was involved in a scheme to illicitly transfer corporate funds to a group of stockbrokers through a bogus consulting contract.

140.   On the first day trading resumed on the OTC Bulletin Board, Deer's stock price fell from $2.26 (the price prior to halting of trade) to $0.35, then to $0.20 over the following three days reflecting its value based on a fully informed market.

141.   PCAOB standards-compliant audits by GKM provided reasonable assurances to Plaintiffs that financial statements were free of materially false statements and omissions.  In turn, the incorporated information and assurances bolstered the integrity of the market Plaintiffs relied on in making their investment decision.

142.   Because GKM certified false financial statements, Deer was able to present fraudulently inflated earnings and revenue numbers to the general public, greatly increasing the market price for Deer shares beyond its actual value.

143.   Plaintiffs purchased Deer stock at a fraudulently inflated rate based on false statements by all Defendants and continued to own these stocks based on false assurances from Deer and false financial reports certified by GKM.  Absent GKM's reckless audits, lack of independence, and certification of falsified financial statements, Deer would not have successfully traded in the U.S. market. If the level and scope of misrepresentations by Deer had been understood, Plaintiffs would not have purchased Deer securities and would not have suffered the near total loss of their investment.

## FIRST CLAIM

**For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

144.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145.   This claim is brought against Deer, the Individual Defendants, and GKM (described hereafter as "Defendants").

146.   Defendants carried out a plan, scheme, and course of conduct which was intended to and did:  (1) deceive the investing public, including the Plaintiffs; and (2) cause Plaintiffs to purchase Deer's common stock at artificially inflated prices.

147.   Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in an effort to maintain artificially high market prices for Deer's common stock.

148.   Defendants, individually and in concert, directly and indirectly, by use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operation and future prospects of Deer as specified herein.

149.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

150.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Deer's common stock was artificially inflated.  Plaintiffs, relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market, purchased Deer securities at an artificially increased price, suffering damages when the value of their stock plummeted.

151.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchase of Deer stock.

COMPLAINT

## SECOND CLAIM

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants and Ahmed Mohidin**

152. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

153. The Individual Defendants acted as controlling persons of Deer within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions, agency, ownership and contractual rights, the Individual Defendants had the power and authority to cause Deer to engage in the unlawful conduct complained of herein. By reason of such conduct, defendants are liable pursuant to § 20(a) of the Exchange Act.

154. Ahmed Mohidin acted as a controlling person of GKM within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, agency, ownership, contractual rights, participation in and/or awareness of GKM's operations and/or intimate knowledge of false financial statements filed by Deer with the SEC, Ahmed Mohidin had influence and control over the decision-making of GKM including the content and publication of various statements Plaintiffs contend are false and misleading and never corrected.

155. As a direct and proximate result of the Individual Defendants' and Mohidin's wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Deer's common stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A. Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, including interest;

B. Awarding Plaintiffs reasonable costs and attorney's fees; and

COMPLAINT

1      C. Awarding such equitable/injunctive or other relief as the Court may

2         deem just and proper.

3                              **<u>JURY DEMAND</u>**

4  Plaintiffs demand a trial by jury.

6  DATED:    January 9, 2015          SHUSTAK & PARTNERS, P.C.
                                         JONAH A. TOLENO, ESQ.

9                             s/ Jonah Toleno

10                           JONAH A. TOLENO

11                           401 West "A" Street, Suite 2330
                           San Diego, CA 92101
                           Telephone: (619) 696-9500

12                           Facsimile: (619) 615-5290
                           Email: jtoleno@shufirm.com

13                           *Attorneys for Plaintiffs*

COMPLAINT